FILED

2006 Mar-31  PM 03:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ANNIE THOMAS and GLENDA KIZZIAH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 7:04-cv-00170-JEO |
| | ) | |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA and RONNIE HURST, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs Annie Thomas ("Thomas") and Glenda Kizziah ("Kizziah") filed this action

asserting various claims against The Board of Trustees of the University of Alabama ("the

University") and Ronnie Hurst ("Hurst"), under Title VII of the Civil Rights Act of 1964, as

amended, including sexual harassment (Count I) and retaliation (Count II) and under state law for

invasion of privacy (Count III), assault and battery (Count IV), and negligent and/or wanton

hiring, retention, and supervision (Count V).[1]  Specifically, the plaintiffs allege that Hurst

harassed each of them on account of their sex and subjected them to a sexually hostile work

environment and that the defendants retaliated against them after they complained of the sexual

harassment.  (Second Amended Complaint ("Amended Complaint")).[2]

After answering the plaintiffs' amended complaint, the University filed a motion for

partial summary judgment as to the asserted state law claims against it.  (Doc. 20).  The

---

[1]Counts One, Two, and Five are brought against the University.  Counts Three and Four are brought against the University and Hurst.

[2]The Second Amended Complaint is located at document five in the Clerk's record.

defendant's motion for partial summary judgment was granted.  The state law claims, to the extent that they were asserted against the University were dismissed.  (Doc. 24).  The University has filed this second motion for summary judgment as to the plaintiff's Title VII claims against it (Counts One and Two).  (Doc. 26).  In support of the motion, the University filed a brief (doc. 27) and evidentiary materials (doc. 26, Attachments).  The plaintiffs each filed briefs in opposition to the defendant's motion.  (Doc. 31 & 33).[3]  They have also filed evidentiary materials in support of their opposition.  (Doc. 32).  The University submitted a reply to the plaintiffs' opposition.  (Doc. 34).  Upon consideration, the court finds that the defendant's motion is due to be granted.

**FACTS**[4]

**Annie Thomas**

Thomas began working at the University as a custodian in January 1998.  (Thomas' Deposition ("Thomas Dep.") at pp. 15, 24).  Thomas attended an employee orientation and was given a booklet describing the University's sexual harassment policy.  (*Id*. at p. 15).  Thomas testified that she read certain parts of the sexual harassment policy and signed a statement acknowledging her receipt of the handbook.  However, she further testified that she was not given a detailed explanation of the policy.  (*Id.*; Def. Ex. 1).[5]

---

[3]Upon motion, and after a hearing, counsel for plaintiff Thomas was released from further representation of Thomas. She is proceeding *pro se* at this juncture.

[4]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[5]"Def. Ex. ___ " are the exhibits attached to Thomas' deposition.  References herein to "Ex. ___" are to the exhibits attached to the motion for summary judgment at document 26.

The University's sexual harassment policy states, in part:

2.  Hostile Environment Sexual Harassment

Unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature constitute "hostile environment sexual harassment" when such conduct is directed toward an individual because of his or her gender and has the purpose or effect of 1) creating an intimidating, hostile, or offensive work or academic environment, or 2) unreasonably interfering with another's work or academic performance.  Generally, a single sexual joke, offensive epithet, or request for a date does not constitute hostile environment sexual harassment; however, being subjected to such jokes, epithets or requests repeatedly may constitute hostile environment sexual harassment.

. . . .

B.  Reporting of Sexual Harassment Allegations

Persons who believe they have been victims of sexual harassment should report the incident(s) immediately to appropriate administrative officials as set forth below.  Delay in reporting makes it more difficult to establish the facts of a case and may contribute to the repetition of offensive behavior.

. . . .

2.  Assurance Against Retaliation

This policy seeks to encourage students, faculty, and other employees to express freely, responsibly, and in an orderly way opinions and feelings about any problem or complaint of sexual harassment.  Retaliation against persons who report or provide information about sexual harassment or behavior that might constitute sexual harassment is also strictly prohibited.  Any act of reprisal, including internal interference, coercion, and restraint, by a University employee or by one acting on behalf of the University, violates this policy and will result in appropriate disciplinary action.

. . . .

C. Reporting Channels

. . . .

3.  Employee Complaints

Employees should report complaints of sexual harassment to the Designated Sexual Harassment Resource Person of the college, school, or administrative division in which they are employed, or to the Office of Human Resources. The name and location of the Designated Sexual Harassment Resource Person can be obtained from the Dean's Office, the Vice Presidents' Offices, the Office of the Provost, or the Office of Equal Opportunity Programs.

Employees who believe for any reason that they cannot effectively communicate their concern through any of these channels may consult the University Compliance Officer in the Office of Equal Opportunity Programs, or if conflicts exist with the University Compliance Officer, employees may consult with the Provost.

Employees who are victims of sexual assault or sexual harassment may seek advice and referral from the University's Women's Center; however, the Women's Center neither receives formal complaints nor conducts investigations.

(Ex. 8 (Part A), pp. 000653-55).[6]

Thomas alleges that, beginning in January 1999 and continuing until March 2002, her supervisor, Hurst, sexually harassed her. (Thomas Dep. at p. 9; Def. Ex. 10). Thomas testified during her deposition that she spoke to fellow co-workers about these incidents, but did not attempt to take any formal action until March 2002, when she told her union representative, Debra Hughen, that she was being sexually harassed by Hurst. (Thomas Dep. at pp. 21-22). Hughen asked Thomas to document her complaint, but she never did. (*Id.* at pp. 61, 88). Only after Thomas was suspended by Hurst for an altercation, which occurred on April 1, 2002, between Thomas, Gwen Hinton, and Daisy Stines,[7] did Thomas first make a verbal complaint of harassment to management. (*Id.* at pp. 112, 212-16).

As a consequence of this altercation, Thomas was sent home by Hurst, given a written

---

[6]References to the exhibit page numbers are to the "Bates" number located in the lower right-hand corner when they are provided.

[7]In other parts of the record, it shows Daisy's last name as "Stines" and "Stine." For consistency, it will appear as "Stines" throughout this opinion.

4

warning, and moved to a different work area.  (*Id.* at pp. 212-16; Def. Ex. 2 & 3).  Shortly after this event, Thomas called Janice Palmer ("Palmer"), the Manager of Workforce Development, to complain about being disciplined.  (Thomas Dep. at pp. 84-85, 213-14; Def. Ex. 3).[8]  During this conversation, plaintiff Thomas allegedly cursed at Palmer.[9]  (*Id.*).  A disciplinary meeting was held on April 4, 2002, as a result, and it was then Thomas first informed management she planned to file a sexual harassment charge against Hurst.  (Thomas Dep. at p. 214; Def. Ex. 3).

After this meeting, on April 12, 2002, Thomas filed a formal complaint with Palmer.  (Def. Ex. 7).  On April 19, 2002, Thomas filed a Discrimination Charge with the EEOC.  (Def. Ex. 10).  Thomas affirmatively states that the filing of the sexual harassment claim against Hurst was not in response to her suspension.  (Thomas Dep. at pp. 214-15).  Rather, Thomas testified that the reason for her delay in reporting Hurst was, in part, because she did not know who the appropriate person was to report the incident to and, in part, because she feared for her job and that of Hurst.  (*Id.* at pp. 30-31, 253).  Thomas further testified that Hurst told her not to report the harassing incidents because they both could lose their jobs if she complained about the harassment.  (*Id.* at pp. 11-14, 139).

After taking Thomas' statement, Palmer began an investigation into the matter.  She interviewed several co-workers, some on more than one occasion.  (*Id.* at p. 136; Def. Ex. 7).  None of the witnesses Palmer interviewed could corroborate Thomas' allegations, although Thomas later testified that Palmer failed to interview every witness she named, specifically Ruby

---

[8]The plaintiff does not deny this conversation, but asserts that she does not remember the same.  (Thomas Dep. at p. 85).

[9]When looking at the transcript, it is not clear whether the plaintiff was talking with Palmer or Joe Thomas, Hurst's supervisor.  (*Id.*).  It appears that counsel mistakenly used both names when referring to the relevant notes of the incident.  The distinction does not change the outcome in this matter.

Hemphill and Ronald Steadman.  (Thomas Dep. at p. 75).  No evidence was presented to the court concerning Ronald Steadman, but Ruby Hemphill has since then submitted a sworn affidavit in which she denies witnessing any inappropriate conduct by Hurst.  (Def. Ex. 5).  Thomas further testified that her other co-workers did not corroborate her story because they were either friends with Hurst or feared for their jobs.  (Thomas Dep. at pp. 28-29, 79).

After Palmer completed her investigation, Hurst was sent a letter on April 24, 2002, stating that the investigation did not conclusively reveal that he was guilty of sexual harassment, but that he would be suspended for five days because he "willingly participated in conversations of a sexually explicit nature" with his subordinates.  (Def. Ex. 6).  In addition, Hurst was required to attend additional training on sexual harassment in the workplace.  (*Id.*).  Thomas was also sent a letter on June 6, 2002, informing her that the investigation was complete, appropriate action would be taken, and that she would no longer be assigned to work with Hurst.  (Def. Ex. 5).

At the time of her deposition in 2004, Thomas was still working with the University.  (Thomas Dep. at pp. 8-9, 139-40).[10]

### The Alleged Sexual Harassment Involving Thomas

Thomas alleges several incidents of verbal and physical sexual harassment by Hurst, starting in January 1999 and continuing until March 2002.  (Thomas Dep. at p. 9).  The first incident of sexual touching she described, occurred sometime in January 1999, while Thomas, Hurst, and a fellow co-worker were in the break room.  (*Id.*).  According to the plaintiff, Hurst got on top of a table and asked her to come over and touch him.  (*Id.*).  Thomas stated that she

---

[10]In her brief, Thomas states that she is no longer employed with the defendant.  (Doc. 32 at p. 1).  She does not state when her employment terminated.

refused, but that Hurst then came over to the women and asked if he could touch Thomas.  (*Id*.).

Again, she said no and told Hurst he could not touch her.  (*Id*.).  Thomas stated that then, as she

stood up, Hurst attempted to grab her between her legs, but that she jumped out of the way so

that he only managed to touch her thigh.  (*Id*. at p. 10).  Thomas testified that, afterwards, Hurst

told her that they could lose their jobs if she reported the incident.  (*Id*. at pp. 11-14).  Thomas

spoke to other co-workers and her mother about the incident, shortly thereafter, but did not file a

formal complaint.  (*Id*. at p. 13).

The second incident of sexual touching occurred sometime in May 2001, while Hurst and

Thomas were cleaning apartments together.  (*Id*. at p. 18).  Thomas stated that Hurst gave her a

hug and apologized about having to reprimand her.  (*Id*.).  Thomas testified that then, as she

stood up to walk away from Hurst, her hand slipped and accidentally grazed his buttocks.  (*Id*. at

p. 19).  Thomas said she apologized and told Hurst it was an accident, but then, as she walked

away Hurst grabbed and squeezed her buttocks.  (*Id*.).  Thomas testified that, while Hurst was

doing this, he was telling her that her "butt was soft and it felt good."  (*Id*.).  Thomas said Ruby

Hemphill was present at the time and witnessed the entire incident.  (*Id*. at p. 21).  In response,

Thomas said she told Hurst that she did not like him grabbing her, but did not tell anyone else

about the incident.  (*Id*. at p. 23).

The third incident of sexual touching occurred sometime in November 2001, while

Thomas and Hurst were working together in New Hall.  (*Id*. at pp. 27-28).  Thomas stated that

Hurst grabbed her buttocks and told her "[she] had a big soft, firm butt."  (*Id*. at pp. 27-28).

Thomas said she told fellow co-workers, Natalie Hoover and Daisy Stines, but that they did not

come forward because they feared for their jobs and Daisy Stines had just bought a new house.

(*Id*. at pp. 28-29).  Thomas did not report this incident to anyone in management.  (*Id*. at pp. 29-30).

The fourth incident of sexual touching occurred in January 2002, while Hurst, Thomas, Hurst's brother, Donnie, and another man named Henry were all working together.  (*Id*. at pp. 31-36).  Thomas testified that Hurst's brother began to make comments suggesting that Thomas and Hurst could go over to his double-wide trailer and "do a couple of things."  (*Id*. at pp. 35-36).  Thomas refused and said they could not do that.  (*Id*. at p. 36).

Then, following this conversation the other two men left and Thomas and Hurst began to carry a buffer downstairs to put it away.  (*Id*. at p. 37).  While they stopped for a rest, Hurst grabbed Thomas' buttocks.  (*Id*.).  In response, Thomas said she turned around and told Hurst to stop and not to do that.  (*Id*. at p. 38).  Hurst told Thomas that he did it because she had touched his buttocks earlier, but then he apologized after Thomas explained that she accidently touched him.  (*Id*.).  Hurst went on to tell Thomas, "that sure felt good . . . you got a big soft butt, that's something I been wanting to do for a long time, just touch your butt . . . ."  (*Id*.).

Once the two finally got the buffer downstairs, Hurst pulled Thomas to him from behind, put his hands through her arms and began squeezing her breasts.  (*Id*. at p. 39).  Thomas said that she told Hurst to stop, but that he responded by saying, "you know you like that girl . . . go ahead and tell the truth."  (*Id*. at p. 40).  Thomas told Hurst she did not like it and that he was not to do that anymore, to which Hurst apologized.  (*Id*.).  There were no witnesses to this incident.  (*Id*. at p. 40).

The next day, while Hurst came back to check supplies, he slapped and grabbed Thomas' buttocks.  (*Id*. at pp. 41-42).  Thomas told Hurst to stop and that she did not like him doing that,

to which Hurst again apologized.  (*Id.*).  Thomas did not report these incidents to anyone in management.  (*Id.* at p. 44).

Thomas also testified that, throughout these incidents, Hurst would repeatedly walk past her and brush up against her breasts, later claiming that it was an accident.  (*Id.* at pp. 25-27).  Thomas testified that afterwards Hurst would laugh and smile and tell her how soft her breasts were.  (*Id.* at p. 27).

Finally, Thomas testified about a Christmas party held in December 2001, in which she and Hurst were dancing together.  (*Id.* at pp. 48-55).  Thomas said Hurst was "pulling [her] up" and "dancing nasty" and that she did not want to dance with him, but did so after others encouraged her to do so.  (*Id.* at p. 48).  During the dance, Thomas testified that she was "hunching" and "moving back and forth," while Hurst was on the ground between her legs.  (*Id.* at pp. 49-53).  Thomas said that her buttocks may have touched Hurst's back, but then she later recanted and said she probably did not touch him.  (*Id.* at pp. 50-53).  While it appears that this dance was somewhat provocative, Thomas testified that it was voluntary and she does not allege that this incident constituted sexual harassment on Hurst's part.  (*Id.* at p. 49).

In addition to the instances of sexual touching, Thomas testified that Hurst also made several derogatory comments and sexual advances toward her, intermittently, throughout this entire time period.  (*Id.* at pp. 44-45, 202).  Those comments included: "Girl I bet you got a fat cat down there.  I bet you got some good stuff"; "You've got some big soft firm titties"; You've got a big soft butt.  It sure is firm"; "Do you have a hairy or bald cat"; "I bet you give good head"; "Does your boyfriend ever tell you that you are good in bed"; "Do you give your boyfriend blowjobs"; "Does your boyfriend eat you"; and "You got some big sexy thighs."

(Amended Complaint at ¶ 11). Thomas did not report these comments to management before April 2002. (Thomas Dep. at p. 59).

## The Alleged Retaliation

Thomas further claims that the University retaliated against her in response to her filing a formal complaint of sexual harassment against Hurst. Specifically, Thomas testified that following her complaint, Hurst gave her a lower performance evaluation on June 1, 2002, which contained false allegations. (Pl. Ex. B).[11] Specifically, Thomas points to Hurst's comments, describing her as needing improvement in listening skills and judgment, and being too "argumentative." (*Id*.). Thomas notes that in her prior evaluation on June 8, 2001, she was described as doing an "Outstanding Job all year long." (Pl. Ex. C). These evaluations are said to be a factor in deciding whether an employee receives a raise or bonus and, as a consequence of Hurst's lower evaluation, Thomas alleges that she did not receive a raise or bonus.

Thomas received the same overall score for her evaluation on June 1, 2002, as she did for her prior evaluation on June 8, 2001, which was a 4 out of 5 or "[e]xceeds expectations." (Pl. Ex. B & C). Thomas testified that she did receive two raises and a bonus since filing her formal complaint on April 12, 2002. (Thomas Dep. at p. 171). The first raise took effect on August 16, 2002, and the second, sometime in January, 2004. (Palmer Aff. at ¶ 12).[12] Thomas also acknowledges that she was given a bonus of $153.09 on August 23, 2002. (*Id*.).

In addition to her lower evaluation, Thomas further alleges that the defendants retaliated against her by not allowing her to work as many overtime shifts during home football games.

---

[11]The plaintiff's exhibits are located at document 32.

[12]Palmer's affidavit and exhibits are located at Ex. 9.

10

Thomas testified that she was only allowed to work one or two football games during the 2002

season, yet, during the 2001-2002 season, she had worked nearly all of the home football games.

(Thomas Dep. at pp. 155-57).  Thomas also testified that she did work nearly every home game,

subsequent to her complaint, during the 2003-2004 football season.  In addition, Thomas testified

that she had been written up for an altercation, which occurred at the end of the 2002-2003

season, between her and the shift supervisor, Shirley Wynn.  (*Id.* at p. 181; Def. Ex. 11).

Thomas also alleges that the defendant retaliated against her by transferring her to a less

desirable work area, which required more work than her original area.  Thomas was reassigned to

a new work area following the conclusion of the University's investigation of her complaint.

(Thomas Dep. at p. 86).  Thomas did not lose any pay as a result of the transfer and testified that

she is not unhappy about it.  (*Id.*).

**Claims of Glenda Kizziah**

Kizziah began working as a custodian at the University in June 2001.  (Kizziah Dep. at p.

10).[13]  In November 2001, she was transferred to work under the supervision of defendant Hurst.

(*Id*. at p. 40).  Kizziah attended an orientation session when she started working for the

University, which informed her about the University's sexual harassment policy and included a

video.  (*Id*. at p. 187).  Kizziah testified that she was aware of the University's policy, signed a

statement acknowledging her receipt of information regarding the facility's contact person, and

was given a copy of the employee handbook describing the policy.  (*Id*. at p. 188).  Kizziah was

given the same handbook as Thomas, which contains the University's sexual harassment policy

and reads, in part, as listed above.  (Ex. 8 (Part A)).

---

[13]The deposition is located at exhibit 2 in the defendant's evidentiary submission.

On either August 15 or August 18, 2003, Kizziah filed charges with the University of Alabama Police Department alleging that defendant Hurst sexually assaulted her.  (Kizziah Dep. at pp. 150-52).  The University was then contacted by the University Police and an immediate investigation was conducted by Janice Palmer and Coress Brandon, the Associate Executive Director of Facilities.  (*Id*. at p. 172).  Kizziah later filed a Discrimination Charge with the EEOC on August 25, 2003.  (Def. Ex. 12 (Kizziah)).[14]

During her investigation, Palmer interviewed Kizziah, Hurst, and eight of Kizziah's co-workers, some on more than one occasion, but concluded that there was no evidence to corroborate her complaint.  (*Id*. at pp. 172, 191).  Kizziah was sent a letter from Janice Palmer on August 25, 2003, explaining that her claim could not be corroborated, but that she would be reassigned to work under another supervisor to prevent any discomfort she might feel in continuing to work under Hurst.  (Def. Ex. 7 (Kizziah)).  Kizziah was, in fact, later transferred. (Kizziah Dep. at p. 29).

Although Palmer found no evidence to corroborate Kizziah's complaint, she did uncover evidence that Kizziah had engaged in inappropriate conduct in the workplace in April 2003.[15] (*Id*. at p. 172).  In response, Coress Brandon sent Kizziah a letter as a written warning and required her to attend sexual harassment training.  (Def. Ex. 8 (Kizziah)).

---

[14]These exhibits are located with the plaintiff's deposition.

[15]The warning letter stated:

. . . . During the investigation of your complaint, and follow up with several of your co-workers, it is apparent that you have repeatedly brought items sexual in nature or overture to work.  In listening to your co-workers, this is a part of your interaction with others on a regular basis.  You admitted to bringing several specific items to show or display to your colleagues on the job.

(Def. Ex. 8 (Kizziah)).

12

Hurst was also sent a letter on August 26, 2003, informing him that he was to be suspended without pay by the University for ten days for "failure to implement supervisory procedures."[16]  (Def. Ex. 9 (Kizziah)).  Hurst was also required to attend additional sexual harassment training.  (Kizziah Dep. at p. 201; Def. Ex. 9 (Kizziah)).

In addition to the August 13, 2003 event, Kizziah alleged other incidents of physical and verbal harassment by Hurst.  Kizziah testified that she had been trying to transfer to another position and did not file a report sooner because she was afraid she would be transferred back to the "rolling crew," which had been a tougher position.  (*Id*. at pp. 65, 71).

### The Alleged Sexual Harassment

The primary basis of Kizziah's sexual harassment claim concerns the August 13th incident, which occurred while Hurst, Kizziah, and others were working in Mary Burke dormitory.  (*Id*. at p. 125).  Kizziah stated that she, along with Hurst, Chandrika Johnson, and possibly Virginia Hall, were working together in one of the student dorms.  (*Id*. at p. 129).  Hurst

---

[16]The letter stated:

You are being suspended for failure to implement supervisory procedures and follow specific instructions based on April 24, 2002, correspondence to you.  Your suspension will be for ten days, beginning Wednesday, August 27, 2003, through Wednesday, September 10, 2003.  You will return to work on Thursday, September 11, 2003.

Although there is no evidence to support the allegation of sexual harassment against you, it is apparent that you mishandled the work environment situation.  According to witnesses, you have communicated to staff that inappropriate comments of a sexual nature should not occur in the workplace.  Each of them, including the complainant, validated that you remove yourself from the discussions or avoid the subject.

Unfortunately, you did not report, nor take steps to prevent, a staff member from bringing items of a sexually offensive nature to the workplace.  In addition, you did not make a clear statement, as a supervisor, that these actions were inappropriate by refusing to accept, or returning, trinkets, gifts or items of a sexual nature, given to you by an employee.  Although you documented these incidents, you did not clearly tell the employee that these actions were in violation of the University's policy.  I continue to be disturbed by your failure to bring closure to this violation of policy.  It is your job as supervisor to insure a non-hostile work environment for the staff.  This is the second time you have been disciplined for failure to perform your supervisory obligations in this area.  Please be advised that further failure in this area could result in termination of your employment.

(Def. Ex. 9 (Kizziah)).

and Chandrika Johnson began lifting up the metal-railed beds in the room against the wall and discovered coins all over the floor under them.  (*Id*. at pp. 126-27).  Hurst sent the others out of the room to get a vacuum and/or trash bags, while he and Kizziah were left alone in the room. (*Id*. at pp. 131-32).

Kizziah testified that as she was on her hands and knees picking up the money, Hurst forcibly touched her vagina.  (*Id*. at pp. 127-28).  Kizziah stated that, ". . . the next thing I knew I felt a pressure in between my legs and [Hurst] just rammed his hand real hard, so hard my panties went inside of my vagina . . .." (*Id*.).  In response, Kizziah said she jumped forward and hit her head on one of the bed rails, then flipped over to see Hurst standing behind her grinning.  (*Id*.). Kizziah testified that the door to the room was slightly ajar and she could see Virginia Hall looking through the opening with an "astonished" looked on her face.  (*Id*. at p. 128).  Virginia Hall has since then submitted a sworn affidavit, in which she denies having witnessed the incident.[17]  (Ex. 4 at pp. 2-3).

Kizziah said she avoided Hurst for the rest of the day and later told Chandrika Johnson about what happened during their 2:00 p.m. break.  (Kizziah Dep. at p. 144).  Kizziah worked the remainder of the day, but called in sick the next day on Thursday.  (*Id*. at pp. 148-49).  On the following day, Kizziah came back and worked a full day.  (*Id*. at p. 161).  During her shift, Kizziah said she spoke to Virginia Hall, Natalie Hoover, and Tracy Watkins about the incident. (*Id*.).

Shortly thereafter, Kizziah reported the incident to the University of Alabama Police.  (*Id*.

---

[17]This is not inconsistent with Kizziah's deposition testimony that she did not know if Hall saw the incident.  (Kizziah Dep. at p. 142).

at pp. 151-52).  The University Police investigated the incident and found no cause for the issuance of a warrant.  (*Id*. at p. 190; Def. Ex. 10 (Kizziah)).  During the course of their investigation, the University Police contacted the University, which then immediately began an investigation on August 18, 2003.  (Kizziah Dep. at p. 172; Def. Ex. 6 (Kizziah)).

In addition to the sexual assault on August 13, 2003, Kizziah also testified that, on more than one occasion, Hurst would hug her from behind in an inappropriate manner, which she felt had "sexual overtures."  (*Id*. at pp. 230-31).  Kizziah stated that Hurst would press his body against hers and that she would hit him and walk away.  (*Id*.).

Kizziah also testified that, beginning in January or February 2003 and continuing until August 2003, Hurst engaged in repeated instances of verbal sexual harassment.  Kizziah did not report any of these incidents to management prior to her formal complaint on August 18, 2003.  (*Id.* at p. 65).

Kizziah testified that sometime around January or February 2003 Kizziah and Hurst were driving to the Capstone Clinic.  (*Id*. at p. 47).  During the ride, Hurst made a comment that she "was a good looking woman and . . . carried [herself well]"  (*Id*.).  Hurst later apologized for making the comment, though Kizziah did not tell Hurst the comment made her uncomfortable.  (*Id*. at pp. 48-49).

Kizziah also stated that Hurst made comments in reference to her and another co-worker, Chandrika Johnson, calling them his "chocolate and vanilla."  (*Id*. at pp. 53-55).  Hurst would also make obscene gestures towards them, as they walked by his office, sticking out his tongue and wiggling it at them.  (*Id*.).  Hurst also told Kizziah twice, during this period, that "once you go black you don't go back."  (*Id*. at p. 55).

Kizziah described another incident, in which Hurst told her that he had received a phone call from a lady wanting to hire her for a part-time job that paid well.  (*Id*. at pp. 55-56).  When Kizziah asked who it was, Hurst said that it was wife and that she wanted to hire a part-time lover for her husband.  (*Id*.).  Kizziah told Hurst that she did not want to hear these remarks anymore.  (*Id*.).  These comments were made during 2003.  (*Id*. at p. 57).

Kizziah also testified that Hurst attempted to pressure her into having sex with him, while working in front of the Martha Parham building.  (*Id.* at p. 62).  Kizziah said she rejected Hurst's advances and told him she was engaged, but that Hurst continued and stated, "Yeah, but it'll be good for both of us."  (*Id*.).  Kizziah said this made her angry and she told him, "All right, that's enough," and left.  (*Id*.).  Hurst later called Kizziah on her cell phone to apologize.  (*Id*.).

Kizziah testified that these sort of calls, in which Hurst would call her personal cell phone, were common and occurred at least 30 times during this same period.  (*Id*. at pp. 232-35).  Kizziah said she eventually had to change her cell phone provider and get a new phone. (*Id*.).  Many of these calls occurred while Kizziah was on duty, but she testified that they were not entirely work-related.  (*Id*.).

Kizziah also testified about two other incidents of questionable conduct by Hurst, one involving a "health advisory" made to several female employees about using white towels to avoid infections and another concerning sexually explicit jokes pulled from the Internet.  (*Id*. at pp. 279-80).  However, Kizziah testified that, although the first incident was somewhat shocking, she did not find this conduct to be offensive.  (*Id*.).

### The Alleged Retaliation

In addition to her claim of sexual harassment, Kizziah alleges that the University

16

retaliated against her in response to her sexual harassment claim against Hurst.  Specifically, she alleges that the University began investigating her following her complaint and gave her a written warning on August 25, 2003.  (Amended Complaint at p. 5).  Kizziah further alleges that the defendant prevented other women from coming forward with information regarding Hurst and that, since then, she has been transferred to an older, dirtier place to work.  (*Id.*).

The written warning Kizziah received on August 25, 2003, was allegedly in response to several incidents of inappropriate conduct by Kizziah, which Palmer discovered during her investigation.  (Def. Ex. 8 (Kizziah)).  Although its not entirely clear what specific conduct was the basis for this disciplinary action, Palmer's report detailed several instances of sexually explicit conduct involving Kizziah during this time period.  (*Id.*).

The first incident occurred in December 2001.  Kizziah purportedly gave Hurst a Christmas gift, containing a sexually explicit card.  (*Id.* at pp. 83-84).  The card makes reference to the size of Santa Claus's penis and the back of the card has a picture of a male crotch in bikini underwear.  (Def. Ex. 2 (Kizziah)).

In addition to the card, sometime around March 2003, Kizziah brought a toy "walking penis", belonging to a student, into the break room to show her co-workers.  (*Id.* at pp. 92-96).  Kizziah testified that Hurst came into the room while this was happening, but did not say anything to Kizziah or tell her to put it away.  (*Id.* at pp. 95-96).  Hurst and Kizziah's co-workers laughed at the toy.  (*Id.*).

Another incident occurred on April 1, 2003 ("April Fool's Day"), in which Kizziah brought an apron to work with a "pop-up penis," extending approximately two feet long, made of a pantyhose leg stuffed with stockings and it could be raised up by fishing string to look erect.

17

(*Id*. at pp. 100-06).  Kizziah showed the apron to her co-workers in the break room.  (*Id*. at p. 108).  At some point, defendant Hurst's brother, Donnie Hurst, put on the apron and showed it to him in his office.  (*Id*. at p. 109).  Defendant Hurst told Kizziah not to let anyone else see the apron and warned her that, if someone complained, she would be in trouble.  (*Id*. at p. 112).

Another purported incident of inappropriate conduct by Kizziah occurred on March 6, 2003, when Kizziah set fire to a string hanging from a co-worker's crotch.  (*Id*. at pp. 201-02; Def. Ex. 10 (Kizziah)).  Kizziah denies that this incident ever occurred.  (Kizziah Dep. at pp. 201-02).

Although Kizziah was informed that she had the right to appeal the issuance of the written warning, she did not do so.  (*Id.* at p. 199).  Kizziah admitted during her deposition that she told sex-related jokes at the workplace, but noted that her other co-workers had engaged in similar sorts of behavior and were not disciplined.  (*Id*. at pp. 208-09).

Kizziah was transferred to another work area following the conclusion of the University's investigation of her allegations.  (*Id*. at p. 29).  Kizziah testified that she is happy working in her new area and did not lose any pay as a result, but "wondered why [she] was transferred and he got to stay."  (*Id*. at pp. 216, 218).

## DISCUSSION

### Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

**Hostile Work Environment/Tangible Adverse Employment
Action Sexual Harassment**

The plaintiffs assert sexual harassment claims against the University based on Hurst's conduct while he was their supervisor.  The University contends that summary judgment is due to be granted on the plaintiffs' claims because Thomas' claim is time-barred and the conduct complained of by the plaintiffs is not sufficiently severe, pervasive, or unwelcome in either situation.  It further contends that it is entitled to summary judgment because it is entitled to relief under *Faragher/Ellerth*.[18]

It is now well-settled that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998).  To establish a claim for a hostile or abusive working environment, an employee must show the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment. . . ; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483

---

[18]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) and *Burlington Industries v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

(2000)).  In *Gupta*, the Eleventh Circuit stated:

> The fourth element . . . is the element that tests the mettle of most sexual
> harassment claims.  Requiring the plaintiff to prove that the harassment is severe
> or pervasive ensures that Title VII does not become a mere "general civility code."
> *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.
> Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583.  Title VII includes a prohibition of sexual harassment, but it is clearly

not a federal civility code.  *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and

'does not reach genuine but innocuous differences in the ways men and women routinely interact

with members of the same sex and of the opposite sex.'  Instead, Title VII prohibits only the type

of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's

employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509

(11th Cir. 2000) (quoting *Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to

hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to
> alter an employee's terms or conditions of employment includes a subjective and
> an objective component. . . .  The employee must subjectively perceive the
> harassment as sufficiently severe and pervasive to alter the terms or conditions of
> employment, and this subjective perception must be objectively reasonable.  The
> environment must be one that a reasonable person would find hostile or abusive
> and that the victim subjectively perceives to be abusive.  Furthermore, the
> objective severity of the harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive. . . .
> The courts should examine the conduct in context, not as isolated acts, and
> determine under the totality of the circumstances whether the harassing conduct is
> sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's
> employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted).  The Supreme Court in

*Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in

the terms and conditions of employment . . . ."  *Faragher*, 524 U.S. at 788 (citing *Carrero v. New*

*York City Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792

F.2d 746, 749-50 (8th Cir. 1986)).

The plaintiffs allege that the facts are sufficient to meet the burden described in *Faragher*

and *Gupta*.  Both plaintiffs are members of a protected class.  Both were treated in a manner that

could be reasonably considered harassment by a jury.  The plaintiffs assert that the incidents

alleged were sexual in nature and collectively were severe and pervasive enough to state a claim.

Because Hurst was acting as their supervisor at the times of these incidents, the plaintiffs further

allege that the University is vicariously liable for damages caused by his behavior.  Thus, the

plaintiffs assert that the motion for summary judgment is due to be denied as to this claim.

### Thomas' Claim Time-barred

The University initially argues that Thomas' claim is time-barred because the physical

harassment is alleged to have ended on either January 2001 or November 2001, more than 180

days prior to her filing an EEOC charge.  (Doc. 27 at p. 29).  However, Thomas alleges that

Hurst engaged in both continuous physical and verbal harassment, beginning in January 1999 and

continuing through March 2002, which would be within 180 days of her EEOC charge.

Under the Eleventh Circuit's "continuing violation doctrine,"

"if a series of discrete acts of discrimination continues into the statutory filing
period, then the cause of action is considered timely filed.  To revive the
otherwise time-barred claim under the doctrine, however, it must be a part of a
pattern or continuing practice out of which the timely-filed incident arose.  When
an employee files a timely charge for a discriminatory act, he may recover for

22

previous acts of discrimination which would otherwise be time-barred to the extent he can meet his burden of proving the existence of a substantial nexus between the acts."

*Lewis v. Bd. of Trustees of Ala. State Univ.*, 874 F. Supp. 1299, 1303 (M.D. Ala. 1995)

(quoting *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 799-800 (11th Cir. 1988)).

In determining continuing violation, the Court asks, would this event or series of events "alert a reasonable person to act to assert his or her rights at the time of the violation." *Hipp* [*v. Liberty National Life Insurance Co.*], 252 F.3d 1208, 1222 [(11th Cir. 2001)]. In other words, "whether the act was sufficiently permanent in nature to 'trigger an employee's awareness of and duty to assert his or her rights.'" *Watson v. Bally Manufacturing Corporation*, 844 F. Supp. 1533, 1535 (S.D. Fla. 1993) (quoting, *Berry v. Board of Supervisors of L.S.U.*, 783 F.2d 1270, 1273 (5th Cir. 1986)).

*Butler v. Matsushita Communication Industrial*, 203 F.R.D. 575, 583 (N.D. Ga. 2001).

Simply because certain aspects of Hurst's conduct, alleged to have occurred prior to 180 days of Thomas' EEOC charge, were more egregious than his later conduct, does not preclude Thomas from bringing a claim. Thomas alleges that Hurst's conduct constituted an on-going pattern of harassment. Therefore, under the particular facts in this case and the "continuing violation doctrine," the court finds that Thomas' harassment claim is not time-barred.[19]

### Not Based on Gender

The defendant next argues that the alleged harassment was not based on gender because the conduct about which the plaintiffs complain was not directed to them alone as women, but was conduct which could be considered equally offensive to both sexes. (Doc. 27 at pp. 19-20). The court disagrees. Hurst's alleged conduct was not simply inappropriate humor engaged in

---

[19]Certain discrete incidents of harassment, as will be discussed later, were sufficiently severe to warrant reporting to University officials. However, under the circumstances, the court finds that because certain conduct occurred within the relevant period, the earlier conduct cannot be ignored in assessing the totality of the circumstances faced by the plaintiffs.

commonly with other co-workers, but was sexually predatory behavior, aimed specifically at the plaintiffs as women. *See Fitzpatrick v. Winn-Dixie Montgomery*, 153 F. Supp. 2d 1303 (M.D. Ala. 2001).[20]

Thomas and Kizziah both allege that Hurst attempted to pressure them into having sexual relations with him and repeatedly used gender-specific, derogatory language to taunt and tease them. Additionally, both Thomas and Kizziah separately allege specific instances of sexual touching in which Hurst repeatedly grabbed or groped Thomas' breasts and buttocks, and once forcefully touched Kizziah's vagina. In addition, even assuming arguendo that the University's argument were applicable, no evidence was presented indicating that Hurst engaged in similar conduct toward men. Therefore, the court finds that Hurst's conduct was sufficiently based on gender to preclude summary judgment on that ground.

### Not Unwelcome Conduct

The University next argues that, viewing the incidents in the "totality of the circumstances," the conduct which the plaintiffs complain of was not unwelcome. (Doc. 27 at pp. 20-21). It alleges that the plaintiffs actively participated in and invited the conduct which they are complaining of; and therefore, it cannot be considered unwelcome for purposes of Title VII. (*Id.*).

---

[20]In *Fitzpatrick*, the court stated:

As the Eleventh Circuit has noted, where a supervisor makes sexual overtures to employees of both genders, or where the conduct is equally offensive to male and female workers, the conduct may be actionable under state law, but it is not actionable as harassment under Title VII because men and women are accorded like treatment. *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982); *see also Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (stating that under Title VII the issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed).

*Fitzpatrick*, 153 F. Supp. 2d at 1306.

In support of its position, the defendant cites *Weinsheimer v. Rockwell Int'l Corp.*, 754 F. Supp. 1559 (M.D. Fla. 1990), in which judgment was granted in favor of the defendant-employer after the plaintiff was found to have actively participated in making sexual comments and using sexual innuendo in the workplace.  However, that case is factually and legally distinguishable. The physical acts involved were different than those in this case and judgment was entered after a non-jury trial on the merits.  Additionally, the court therein noted that "plaintiff's willing and frequent involvement in the sexual innuendo prevalent in her work area indicate that she did not find the majority of such conduct truly 'unwelcome' or 'hostile'."  *Weinsheimer*, 754 F. Supp. at 1564.  Under the present circumstances the court cannot similarly find on a motion for summary judgment.

The conduct in the present case goes beyond mere crude comments and sexual innuendo as the plaintiffs allege repeated incidents of sexual touching by Hurst, which they responded to by continuously telling him that they did not like it or to stop.  The plaintiffs also spoke to other co-workers about Hurst's conduct and made it clear that they did not like it and wanted it to stop.

In addition, the University further argues that Thomas' and Kizziah's delay in reporting demonstrates that the conduct alleged was not unwelcome.  (Doc. 27 at p. 22).  The defendant cites *Balleti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1547 (S.D. Fla. 1995), in support of its argument that an employee must, at some point, bring it to the attention of her co-workers that the complained-of conduct is unwelcome.  Once again, however, the court finds *Balleti* to be distinguishable.  In that case, the plaintiff made a belated complaint about the harassment, she disapproved of the investigation, and "she was among the most prevalent and graphic contributors to the pressroom environment.  Her crude and vulgar behavior far exceeded any

matters of which she complained." *Balleti*, 909 F. Supp. at 1548.

In the present case, although the plaintiffs did delay in reporting the incidents and did participate in some sexual banter, they brought their dislike for Hurst's physical advances to him and other co-workers. There is no evidence that the plaintiffs were approached by the employer or given a similar opportunity to report Hurst, yet declined to do so. Regardless of whether Thomas and Kizziah also engaged in conduct which was inappropriate for the workplace, neither plaintiff did anything to suggest that they were inviting Hurst to grab and touch their private areas or make aggressive sexual advances towards them. Even when considering the dancing incident, the sexually explicit Christmas card, or the other inappropriate conduct, a reasonable person still could have viewed Hurst's actions towards these women as unwelcome or uninvited. This is particularly so, when considering the evidence in the light most favorable to the plaintiffs, as the court must do in resolving the present motion. Therefore, when viewed under a "totality of the circumstances," the court finds that Hurst's conduct was sufficiently unwelcome to preclude summary judgment on that basis. *Mendoza*, 195 F.3d at 1246.

**Not Severe and Pervasive**

The defendant next argues that the conduct alleged was neither subjectively perceived by the plaintiffs, nor could it have been objectively perceived by a reasonable person, as sufficiently severe and pervasive to constitute unlawful sexual harassment. (Doc. 27 at pp. 22-25). As to the subjective component, the defendant again cites the plaintiffs' active participation in similar conduct and their delay in reporting in support of its argument. (*Id*. at p. 23). The court is not particularly impressed by this argument. The sexual jokes and other inappropriate conduct the plaintiffs engaged in was not as egregious and sexually charged as Hurst's conduct. Merely

26

because the plaintiffs participated in conduct that was inappropriate for the workplace does not necessarily give rise to an inference that they could not have perceived Hurst's much more egregious conduct as harassment.  Such an inference is even less likely when considering the plaintiffs repeatedly told Hurst and other co-workers that they did not like his conduct and wanted it to stop.[21]  In addition, the plaintiffs' failure to report Hurst's conduct sooner, although imprudent, does not necessarily support an inference that they did not find it hostile or abusive. Therefore, because the plaintiffs did subjectively perceive Hurst's conduct as harassment, the court must next consider whether a reasonable person would have objectively perceived the conduct as severe and pervasive.

For the alleged conduct to be considered objectively hostile or abusive, courts consider several factors, such as the frequency of the conduct, whether the conduct is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  In reviewing a claim, although the incidents individually may not constitute a Title VII claim, when viewed under a "totality of the circumstances," together they may be significant enough to overcome a motion for summary judgment.  *Mendoza*, 195 F.3d at 1246.

The University argues that Hurst's conduct merely constitutes episodic use of abusive language, gender-related jokes, and occasional teasing, and does not rise to the level of being severe and pervasive.  (Doc. 27 at p. 22).  In addition, the University argues that the conduct did not unreasonably interfere with the plaintiffs' employment because they continued to work for

---

[21]Additionally, the court is precluded at this juncture from making such negative inferences.

the University; were given good evaluations, bonuses and raises; and, generally were happy in their new work areas. (*Id*. at pp. 23-24). Finally, the defendant argues that the conduct alleged by Kizziah was not sufficiently severe or frequent because it primarily involved only a single-incident, she finished her shift after it occurred and came back to work only two days later. (*Id*. at pp. 24-25).

In response, the plaintiffs argue that Hurst's conduct was severe and pervasive because it occurred almost daily; involved sexual comments, groping of private areas, constant sexual degradation, and threats of retaliation; made it difficult to concentrate and do their jobs properly; and, occurred during working hours. (Doc. 33 at pp. 6-7). In addition, Kizziah argues that, although the alleged touching primarily involved only the August 13th incident, the psychological effect of the harassment must also be taken into account; and therefore, even a single incident can be sufficiently severe to survive summary judgment. (Doc. 31 at p. 6).

Because the conduct alleged must be viewed under a "totality of the circumstances," determining whether it is sufficient to be objectively severe and pervasive is necessarily a fact-intensive inquiry. *Mendoza*, 195 F.3d at 1246. Therefore, it is appropriate to first consider other cases, in comparison, which have granted summary judgment on this issue. The *Mendoza* court provided many examples of such cases:

> Other circuits have applied these factors to delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII. Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal. *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including [the] comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support

28

hostile-environment claim); *Indest v. Freeman Decorating*, *Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.*, No. 93-1720, 1994 WL 136971 (4th Cir. 1994) (holding insufficient under *Harris* seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*,

990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims--supervisor
repeatedly asked about her personal life, told her how beautiful she was, asked her
on dates, called her a dumb blonde, put his hand on her shoulder at least six times,
placed "I love you" signs in her work area, and tried to kiss her once at a bar and
twice at work--were not sufficient for actionable sexual harassment); *see also
DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995)
("A hostile environment claim embodies a series of criteria that express extremely
insensitive conduct against women, conduct so egregious as to alter the conditions
of employment and destroy their equal opportunity in the workplace."); *Indest v.
Freeman Decorating, Inc*., 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual
hostile environment cases decided by the Supreme Court have involved patterns
or allegations of extensive, longlasting, unredressed, and uninhibited sexual
threats or conduct that permeated the plaintiffs' work environment.").

*Mendoza*, 195 F.3d at 1246-47.  The court *Mendoza* went on to state the following:

> In this appeal, the conduct alleged by Mendoza falls well short of the level
> of either severe or pervasive conduct sufficient to alter Mendoza's terms or
> conditions of employment.  Construing the evidence in the light most favorable to
> Mendoza, she presented evidence of four categories of harassing conduct: (1) one
> instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion
> in which Page rubbed his hip against Mendoza's hip while touching her shoulder
> and smiling; (3) two instances in which Page made a sniffing sound while looking
> at Mendoza's groin area and one instance of sniffing without looking at her groin;
> and (4) Page's "constant" following and staring at Mendoza in a "very obvious
> fashion."
>
> As an initial matter, whether Page's conduct testified to by Mendoza
> includes the necessary sexual or other gender-related connotations to be actionable
> sex discrimination is questionable. . . .

*Mendoza*, at 1247.

The defendant cites *Mendoza*, as well as, several of the cases described therein, as

demonstrating that the conduct alleged by the plaintiffs is also not sufficiently severe or

pervasive.  (Doc. 27 at p. 24).  However, the conduct alleged in those cases is distinguishable.

While the plaintiffs' allegations in this case differ in certain ways, both allege comments and

advances made by Hurst that are more direct and sexually explicit than what was present in the

cases cited by the defendant.  In addition, the incidents of touching alleged by the plaintiffs are more egregious and in some instances involved much more than incidental touching. Furthermore, the incidents of touching alleged by Thomas are more numerous.

For example, in *Mendoza* the plaintiff alleged only one instance of touching, in which the individual rubbed his hip against the plaintiff while touching her shoulder.  *Mendoza*, at 1243.  In addition, the other conduct alleged only involved indirect or implied harassment, such as staring, looking the plaintiff up and down, and looking at her groin and sniffing.  *Id.*

In *Hopkins*, which is also cited in the defendant's brief, the plaintiff only alleged two instances of incidental touching in which the individual bumped into the plaintiff and made a remark, and later, touched the plaintiff's back while squeezing into a revolving door.  *Hopkins*, 77 F.3d at 753-54.  In addition, the comments made by the individual in that case were not direct sexual advances, but were described as having "sexual overtones" or stated in a manner that otherwise made the plaintiff simply feel "uncomfortable."  *Id.*

In the next case cited by the defendant, *Quinn*, the plaintiff alleged only a single incident of incidental touching in which the individual intentionally touched her breast with some papers he was carrying.  *Quinn*, 159 F.3d at 768.  In addition, although the comments in that case were inappropriate for the workplace, they were not nearly as sexually explicit as those made by Hurst in the present case.  *Id.*

Finally, in *Gupta*, which is also cited by the defendant, the plaintiff alleged three incidents of touching, the most egregious of which involved touching the inside of the plaintiff's thigh.  The others involved touching her hand and, then later, touching her dress hem.  *Gupta*, 212 F.3d at 579.  In addition, the comments were not sexually explicit, but were described by the

court as being either not sexual in nature or merely "flirtatious." *Gupta*, at 584.

The conduct alleged in the present case is actually more closely akin to what was presented in cases where summary judgment has been precluded.  For instance, in *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit reversed the granting of summary judgment based on conduct somewhat similar to that alleged by the plaintiffs.  In *Johnson*, the plaintiff claimed that she was sexually harassed when her supervisor: (1) made repeated comments that she had a sexy voice; (2) called out her name and winked at her; (3) called out her name and pulled his pants up in an obscene manner, revealing an imprint of his private parts; (4) called out her name and then looked her "up and down" while staring at her in a sexual manner; (5) said to her, "Johnson, I like you and as long as I like you you're going to be all right.  You don't have to worry about your job;"        (6) repeatedly attempted to massage her shoulders against her wishes; (7) stuck his tongue out at her in an obscene manner; (8) inappropriately rubbed his body parts against her; (9) asked her why a person with a body like hers always covered it up; (10) commented that he could "pull [Johnson] up" anytime, a comment Johnson interpreted as a sexual reference; (11) got close to her face as if to kiss her; (12) commented that Johnson "really knocked him off his feet;" (13) stated that "he had to stay on his side of the room;" (14) made inappropriate comments about sex and questioned Johnson about her sex life; and (15) asked her if she ever got lonely. *Id*. at 506.  Although distinguishable, *Johnson* demonstrates the severity and pervasive requirement and the importance of individual consideration of the facts and circumstances.

Likewise, in *Dees v. Johnson Control World Services, Inc.*, 168 F.3d 417 (11th Cir. 1999), the Eleventh Circuit reversed the lower court's grant of summary judgment based on conduct

which is also somewhat similar.  The plaintiff in *Dees* alleged that she was sexually harassed when (1) her co-workers told sexually explicit stories and jokes; (2) her co-workers made comments about her body or those of male firefighters; (3) Jacobs asked her to sit on his lap and when she refused, he picked her up and squeezed her so hard that she urinated in her pants; (4) Jacobs then laughed and told the other firefighters what had happened; (5) Stewart ground his groin into Dees' buttocks after stating "look at that sexy mama, I could just eat you in that skirt.";  (6) Rainey propositioned Dees on a number of occasions, whispering in her ear that she was "the kind of woman I like; you're not only beautiful, you're hot-blooded," or telling her that she needed a "sugar daddy" and that with a body like hers, she would not have to work if she listened to him; and, (7) on numerous other instances, her co-workers grabbed or slapped her butt, groped her leg, or otherwise touched her in a sexually suggestive manner.  *Johnson*, 168 F.3d at 418-19.

The conduct alleged in the present case, while differing in some ways, is more closely akin to the conduct alleged in *Johnson* and *Dees*, than that of *Mendoza* and the other cases cited therein.  Specifically, Thomas alleges six different incidents of touching, in which Hurst grabbed, groped, and slapped her buttocks and breasts.  Thomas also alleges that on a number of occasions Hurst would intentionally brush against her breasts as he walked past her.  In addition, the comments and advances allegedly made by Hurst were extremely explicit and clearly sexual in nature.  Hurst directed these comments and advances at Thomas and they required few, if any, additional inferences or context to understand what was meant.

Furthermore, Kizziah alleges that Hurst forcibly touched her vagina in such a way that her panties actually went inside of her.  Kizziah also alleges that on multiple occasions Hurst would hug her from behind and press his body against her in a manner that had "sexual overtones."

While Kizziah alleges fewer incidents of touching than Thomas, they are clearly more egregious than what was alleged in the cases cited by the defendant.  In addition, the comments and advances Kizziah alleges were also clearly sexual in nature and directed specifically toward Kizziah.

The defendant argues that Kizziah's allegations were not sufficiently severe and pervasive because they primarily involved only a single-incident.  (Doc. 27 at pp. 24-25).  However, this argument ignores the egregiousness of the incident itself, its effects, and the additional conduct alleged.  In a somewhat similar case, *Olson v. Lowe's Home Centers, Inc.*, the Eleventh Circuit reversed summary judgment where the plaintiff alleged only three incidents of physical touching, in which her supervisor twice rubbed himself against her from behind in a sexual manner and once grabbed her and forcefully kissed her.  2005 U.S. App. LEXIS 7958 (11th Cir. May 4, 2005).  The court found that the alleged conduct was sufficiently severe and pervasive because the latter incident had damaging physical and psychological effects, and the defendant-supervisor had made many prior sexually explicit comments and advances specifically toward the plaintiff.  *Id.* at **20.

Likewise, in the present case, the most egregious incident of touching alleged by Kizziah did occur only once; however, Kizziah also alleged additional incidents of inappropriate touching in which Hurst pressed himself against her back in a sexual manner and several other instances of sexually explicit comments and advances directed at her.  In addition, Kizziah stated that after the incident she was physically ill and injured as a result of the touching; called in sick the following day; and sought medical attention.  Therefore, given the egregiousness of the single incident and its effects, as well as, the other conduct alleged, the court finds the defendant's

argument insufficient to support the motion for summary judgment.

Although the conduct alleged by the plaintiffs does not fall squarely within any of the foregoing cases, it is sufficiently egregious that a reasonable person could objectively view it as severe and pervasive for purposes of Title VII.  Therefore, the court finds the conduct alleged by the plaintiffs was both subjectively and objectively severe and pervasive and it declines to grant summary judgment on this basis.

### Employer Liability

The plaintiffs having made out a *prima facie* case of sexual harassment, the court must next consider whether the defendant-employer, the University, can be held vicariously liable for Hurst's actions.  In *Frederick v. Sprint/United Management Company*, 246 F.3d 1305, 1311 (11th Cir. 2001), the Eleventh Circuit Court of Appeals stated:

> [W]hen analyzing whether the employer should be liable for a supervisor's harassment, courts should separate these cases into two groups: (1) harassment which culminates in a "tangible employment action," such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.

In the present case, the plaintiffs allege that as a result of the harassment they each suffered an adverse "tangible employment action," and/or the harassment was sufficient to constructively alter their working conditions.  Specifically, Thomas alleges that she was transferred to an undesirable work area; received a lower evaluation from Hurst; did not receive a raise or a bonus; and was not allowed to earn overtime by working football games during the 2002-2003 season.  Kizziah alleges that, as a result of her harassment claim, the defendant investigated her and gave her a written warning; and transferred her to an undesirable work area.

In addition, both plaintiffs allege that Hurst's conduct unreasonably interfered with their employment by making it more difficult for the plaintiffs to do their job.

In *Johnson*, the Eleventh Circuit recognized a strict liability standard for employers for sexual harassment where a tangible employment action occurred when the alleged harasser was the plaintiff's supervisor and the alleged harasser/supervisor was involved in a tangible employment action against the plaintiff. *Johnson*, 234 F.3d at 509 (citing *Faragher*, 524 U.S. at 807 (1998)). Similarly, in *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1247 (11th Cir. 1998), the court stated that

> any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision. A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was sexually harassed by a fellow employee, and that the harasser took a tangible employment action against her.

The Eleventh Circuit has been "unwilling to read the *McDonnell Douglas-Burdine* framework" into hostile environment claims when there is a tangible employment action involving the harassing individual. *Johnson*, 234 F.3d at 510.

The defendant argues that summary judgment is due to be granted because the plaintiffs did not suffer an adverse "tangible employment action" as a result of their protected activity. (Doc. 27 at p. 17). Furthermore, the defendant alleges that the University had a sexual harassment policy in place; the plaintiffs were aware of the policy, yet unreasonably failed to report Hurst's conduct; and that once the University had actual notice of the conduct, it took immediate action to remedy the situation. (*Id*. at pp. 18-19). Accordingly, the defendant argues that the Supreme Court's decisions in *Faragher* and *Ellerth* provide it with a complete

affirmative defense.  *Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742.

Under *Faragher* and *Ellerth*, where no "tangible employment action" has taken place, an employer may prevail in a hostile work environment case involving alleged harassment by a supervisor if the employer is able to prove that:

> (a) [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

> (b) [the] plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  The promulgation of a workable anti-harassment policy may satisfy the first element's reasonable care standard.  *See Faragher*, 524 U.S. at 807-08 (formal sexual harassment policy with sensible complaint procedure satisfies employer's duty of care).

The defendant's sexual harassment policy contained a grievance procedure, which directs employees to report complaints immediately to "the Designated Sexual Harassment Resource Person of the college, school, or administrative division in which they are employed" or to the "Office of Human Resources."  (Ex. 8 (Part A), pp. 000653-55).  The policy further instructs that "[t]he name and location of the Designated Sexual Harassment Resource Person can be obtained from the Dean's Office, the Vice President's Office, the Office of the Provost, or the Office of Equal Opportunity Programs."  (*Id*. at p. 000655).  The policy also provides alternative reporting channels through the "University Compliance Officer in the Office of Equal Opportunity Programs" and the "Provost."  (*Id*.).

The plaintiffs worked in the Custodial Services Department and Janice Palmer was

identified to all the employees in that department, as their "Designated Sexual Harassment Resource Officer for Facilities." (Palmer Aff. at ¶ 3). Both plaintiffs attended orientation and were given copies of the sexual harassment policy. (*Id*. at ¶ 4). In addition, the policy was posted in the "Supervisor's Office," where the plaintiffs signed-in each day, and in the "Custodial Services Office." (*Id*. at ¶ 3).

As to Thomas, although she alleged Hurst had been harassing her since January 1999, she did not bring this to the attention of management until April 2002, which was more than three years after the harassment began. In fact, Thomas did not complain about the harassment until after the disciplinary meeting on April 4th, concerning the altercation between her, Gwen Hinton, and Daisy Stines. Nonetheless, the University began an immediate investigation and interviewed several employees, some on multiple occasions.

Although the University conducted a detailed investigation, it determined that there was insufficient evidence to corroborate Thomas' sexual harassment claim. None of the witnesses Palmer interviewed supported Thomas' version of the events. However, the defendant did find that Hurst "willingly participated in conversations of a sexually explicit nature" and suspended him for five days without pay and required him to attend additional sexual harassment training. Meanwhile, Thomas was transferred to another work area and was no longer required to work with Hurst.

As to Kizziah, she alleged that Hurst harassed her since January or February 2003, but she failed to bring it to the attention of management until after the incident on August 1, 2003. Again, the University began an immediate investigation into Kizziah's claim. Despite interviewing several witnesses on multiple occasions, Palmer was unable to find any evidence to

corroborate Kizziah's version of the event.  However, the investigation did uncover evidence that Kizziah had engaged in inappropriate conduct in the workplace and that, as Kizziah's supervisor, Hurst had not taken appropriate action in response.  As a result, Kizziah received a written warning and, because this was his second reprimand, Hurst was suspended for ten days without pay and was required to attend additional sexual harassment training.  The University transferred Kizziah to another work area and no longer required her to work with Hurst.

Based on these facts, it is clear that the University has met both conditions required to establish a *Faragher/Ellerth* defense.  The defendant exercised reasonable care in preventing and remedying the alleged harassment by maintaining a comprehensive sexual harassment policy that was well-known, vigorously enforced, and provided alternative reporting channels.  *See Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997) ("an employer is insulated from liability under Title VII for a hostile environment sexual harassment claim premised on constructive knowledge of the harassment when the employer has adopted an anti-discrimination policy that is comprehensive, well-known to employees, vigorously enforced, and provides alternative avenues of redress").  In addition, the plaintiffs unreasonably failed to report Hurst's conduct because they did not adhere to the University's complaint procedure and failed to take any steps that would otherwise have placed it on notice.  "While proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense."  *See Faragher*, 524 U.S. at 807-08.

Thomas waited three years before filing a complaint and Kizziah waited over eight

months from the initial incidents, thus both plaintiffs failed to adhere to the University's

complaint procedure.  The closest evidence presented of a prior complaint was Thomas'

conversation with her union representative, Debra Hughen; however, even that occurred only a

few weeks prior to Thomas' formal complaint.  Once the plaintiffs actually did file a complaint,

the defendant conducted an immediate investigation and acted appropriately, including

suspending Hurst for five days concerning the Thomas investigation and ten days for the Kizziah

investigation.

 The plaintiffs counter that the *Faragher/Ellerth* defense is unavailable because they

suffered adverse "tangible employment action," as a result of Hurst's harassment.  The Supreme

Court in *Ellerth*, defined "tangible employment action" as:

> "[T]he means by which the supervisor brings the official power of the enterprise
> to bear on subordinates.  A tangible employment decision requires an official act
> of the enterprise, a company act.  The decision in most cases is documented in
> official company records, and may be subject to review by higher level
> supervisors.  The supervisor often must obtain the imprimatur of the enterprise
> and use its internal processes."  524 U.S. 742, 762 (citations omitted).

The Eleventh Circuit in *Johnson v. Booker T. Washington Broad. Serv.* further defined the term

as, "a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits."  234 F.3d 501, 512 (11th Cir. 2000) (quoting *Ellerth*, 524 U.S. at 761).

 In considering whether the harassment "*culminates in* a 'tangible employment action,'"

only the actions of the allegedly harassing supervisor themselves are relevant.  *Faragher*, 524

U.S. at 808 (emphasis added).  Of the actions alleged by the plaintiffs, only the purportedly lower

evaluation Thomas received from Hurst and the resulting lack of a raise or bonus, appear to be

actions taken solely by Hurst as a supervisor.  The transfers, the reduction in overtime, the written warning, and other actions, all involved the decisions of other supervisors or persons. Those actions do not constitute "tangible employment actions" in the present circumstances.

As to the actions which could be considered "tangible employment actions," the evidence demonstrates that Thomas actually received the same overall score of "4" on her evaluations for both years in question and, in fact, did receive raises and bonuses subsequent to the latter evaluation.  The only aspect of these allegations that could arguably be considered a "tangible employment action" was the criticism Hurst articulated in various areas within the evaluation. However, the court finds that in this instance such conduct falls short of the "significant change in employment status" described in *Johnson*.

In *Davis v. Town of Lake Park*, the Eleventh Circuit found that conduct similar to that alleged by Thomas was insufficient to constitute an "adverse tangible employment action."  245 F.3d 1232 (11th Cir. 2001).  In *Davis*, the plaintiff-employee brought a Title VII action based on two negative, written memorandums and a temporary removal from his position as the designated "officer-in-charge."  *Id*. at 1235-36.  In affirming the granting of a judgment as a matter of law, the Eleventh Circuit found that the conduct merely constituted criticism of his job performance and did not result in tangible employment consequences.  *Id*. at 1241.

Likewise, in the present case, even when considering Thomas' argument that these negative remarks by Hurst could affect her future employment prospects, such an allegation is far too remote and tangential to meet the standard required of a "tangible employment action."  In addition, no evidence was presented to demonstrate such an effect.  Therefore, because neither plaintiff presented sufficient evidence to create a genuine issue of fact as to this issue, the court

finds that the plaintiffs' alleged harassment did not culminate in "tangible employment action" and the *Faragher/Ellerth* defense applies.

The plaintiffs further argue that, even if the court found that the defense applied, other grounds exist for challenging the defense.  Thomas argues that her delay in reporting should be excused because of the combined effect of Hurst's alleged threats of retaliation and the University's deficient harassment policy.  (Doc. 32 at p. 14).  In support of this contention, she cites *Sparks v. Pilot Freight Carriers*, 830 F.2d 1554 (11th Cir. 1987).  However, not only are the facts of *Sparks* distinguishable from the present case, but its holding is not controlling in light of the Supreme Court's subsequent decisions in *Faragher* and *Ellerth*.  *See Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742.  In contrast to *Sparks*, Hurst did not fire Thomas or take any other adverse tangible employment action against her.  *Sparks*, 830 F.2d at 1556.  More importantly, *Sparks* is distinguishable because Thomas does not assert that Hurst threatened to fire her.  He simply told her that they could both lose their jobs if she complained.  Specifically, Thomas states that he told her "not to report it.  That, you know, cause he could lose his job and he didn't want to lose his job.  So he told me and he said, as well as you can lose yours, I can lose mine, so don't report it.  He told us not to say anything about it."[22]  (Thomas Dep. at p. 12).

In *Walton v. Johnson & Johnson Serv.*, 347 F.3d 1272 (11th Cir. 2003), the plaintiff

---

[22]In *Sparks*, "[t]he court stated that 'where the supervisor exercised the authority actually delegated to him by his employer, by making **or threatening to make**, decisions affecting the employment status of his subordinates,' the employer can be directly liable."  (Doc. 32 at p. 14).  Reading the evidence in the light most favorable to the plaintiff, at best, the record shows that Hurst told Thomas that they both could be fired.  He did not threaten to fire her.  Thomas further specifically stated during her deposition that she

was afraid that [she] would lose [her] job and [she] . . . didn't want him to lose his job.  And [she] was scared of . . . the publicity, the stuff that people would be running around saying, the stuff [she] would have to go through like [she] went through when [she] finally reported it. . . .

(Thomas Dep. at p. 30).

attempted to excuse her failure to report previous harassment premised, *inter alia*, on a claim that she feared (1) that she would not get a position she wanted if she complained, (2) that she might lose her current job given the harasser's purported connections to upper management, and (3) for her safety after the harasser showed her his gun while she was in his apartment.  In rejecting this attempt, the court stated:

> Reporting sexually offensive conduct by a supervisor would for many or most employees be uncomfortable, scary or both.  But because this will often or ordinarily be true, as the Supreme Court certainly knew, its regime necessarily requires the employee in normal circumstances to make this painful effort if the employee wants to impose vicarious liability on the employer and collect damages under Title VII.

*Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 35 (1st Cir. 2003).  Here, Walton could have avoided most, if not all, of the actionable harassment by reporting Mykytiuk's behavior to Ortho officials.  By failing to do so, Walton did not give Ortho an opportunity to address the situation and prevent further harm from occurring.

We also agree with the district court that absent a credible threat of retaliation, Walton's subjective fears of reprisal do not excuse her failure to report Mykytiuk's alleged harassment.  *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) (concluding that plaintiff's failure to report harassment for several months was not based on a "credible fear" that her complaint would fall on deaf ears or that she would suffer an adverse employment action as a result of her decision to file a complaint); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) (holding that plaintiff's subjective fear that she would suffer retaliation for filing a complaint not sufficient to excuse delay in reporting incidents of harassment).  Subjective fears of reprisal may exist in every case, but, as we discussed supra, those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment.  Here, Mykytiuk never told Walton that her job was in jeopardy, nor did he threaten her with physical harm.[23]

---

[23]In a footnote, the court stated:

> Walton did not indicate that Mykytiuk threatened her in any way when he showed her his gun.  She merely indicated that the gun "intimidated" her.  We have no quarrel with that claim, but we are unwilling to say that her subsequent failure to report Mykytiuk, when she was out of his presence, was reasonable due to

We therefore conclude that Walton did not reasonably avail herself of the protections afforded by Ortho's anti-harassment policies, and the district court thus correctly held that Ortho was entitled to the *Faragher* defense as a matter of law.

*Walton*, 347 F.3d at 1290-91.[24]

In the present case, Thomas states that the harassment commenced in January 1999 and continued until she reported it in April 2002. She further alleges specific instances of improper

---

her subjective fear that Mykytiuk might physically harm her. Indeed, the second prong of the *Faragher* defense would be rendered meaningless if a plaintiff-employee could escape her corresponding obligation to report sexually harassing behavior based on an unsupported subjective fear that the employee would suffer physical harm at the hands of her alleged harasser.

*Walton*, 347 F.3d at 1291 n.17.

[24]In *Howard v. City of Robertsdale*, 2006 WL 304552 (11th Cir. Feb. 9, 2006), the court in an unpublished opinion stated:

> The sole issue thus becomes whether Howard's nearly three-year delay in reporting Lassiter's harassment was unreasonable as a matter of law.[ ] Howard asserts her delay was reasonable because both she and other police personnel were scared of Lassiter's violent nature, and she feared retaliation. We have held "absent a credible threat of retaliation ⋯ subjective fears of reprisal do not excuse [the] failure to report ⋯ alleged harassment." *Walter v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290-91 (11th Cir. 2003) (citations omitted). Other courts have agreed that conclusory allegations of feared repercussions are insufficient to overcome an employer's showing of unreasonableness. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) ("A generalized fear of retaliation does not excuse a failure to report sexual harassment."); *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001) ("A credible fear [of retaliation] must be based on more than the employee's subjective belief."); *Shaw v. Autozone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) ("[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment."); *Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 492 (S.D.N.Y. 1998) ("[T]o allow an employee to circumvent the reasonable complaint requirements of *Faragher* and [*Ellerth*] by making conclusory allegations of feared repercussions, would effectively eviscerate [the] affirmative defense⋯").

> We hold Howard's conclusory allegations of feared repercussions fail, as a matter of law, to overcome the unreasonableness of her delay in reporting Lassiter's harassment. Howard demonstrated only a generalized fear of retaliation, and the record offers no objective evidence to substantiate her fear. Nor does Howard explain why, after nearly three years of enduring Lassiter's harassment, she suddenly overcame her fear and developed the courage to complain to the Mayor. As we have repeatedly stated, "the problem of workplace discrimination ⋯ cannot be [corrected] without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999). We recognize Howard may have been reluctant to report Lassiter's harassment, as victims of supervisory harassment often are. On this record, however, we conclude there is no genuine issue of material fact to support a finding that Howard's delay in notifying Robertsdale of the harassment was reasonable.

> Accordingly, the district court did not err in concluding Robertsdale had established the *Ellerth-Faragher* defense by a preponderance of the evidence, and the city is not liable under Title VII based on a vicarious liability theory.

*Id.* at *4 (footnote omitted).

touching in January 1999, May 2001, November 2001, December 2001, and January 2002.

However, she did not inform the defendant until early April 2002 of the same. The court finds as

a matter of law that to be unreasonable. Had she reported the earlier incidents, the defendant

could have addressed her concerns to avoid subsequent incidents. The court further finds as a

matter of law that her attempt to excuse the delay by attributing it to a statement by Hurst that

they could be fired for complaining is insufficient. As noted above, the court in *Walton* rejected

the plaintiff's arguments that she did not report the harassment because of fears of reprisal.

Although the facts in the present case are different, there is no indication in the present matter

that the plaintiff had a reasonable, legitimate fear of retaliation from the University if she

complained. To the contrary, the University had an anti-harassment policy that specifically

prohibited retaliation. (Ex. 8 (Part A)). There is no evidence that the University retaliated

against any employee for making a complaint. Additionally, there is no evidence that the

University "permitted or turned a blind eye to incidents of sexual harassment in the workplace"

once it was informed of the same. *Taylor v. CSX Transportation*, ___F. Supp. 2d ___, 2006 LW

544519 (M.D. Ala. March 6, 2006). This court finds that the plaintiff's reasoning "lack[s] the

required concreteness to survive a motion for summary judgment. . . ." *Id*. at *20.

 In sum, the University had an effective and well-enforced sexual harassment policy in

place with multiple channels for reporting complaints. Therefore, Thomas' failure to report prior

instances is not excused by Hurst's actions and the defendant still is entitled to assert its

*Faragher/Ellerth* defense.[25]

---

[25]Kizziah does not counter the defendant's *Faragher/Ellerth* defense with an assertion that she failed to report the harassing conduct that occurred during January and February 2003 because she was fearful of reprisals. Instead, she asserts that summary judgment is due to be denied premised on the "sudden" nature of Hurst's conduct. (Doc. 31 at p. 6).

As just noted, Kizziah argues that, because her claim involves an instance of "sudden

sexual harassment," the *Faragher/Ellerth* defense is unavailable to the University.  The Eleventh

Circuit has not taken a position on this issue.  *See Walton*, 347 F.3d at 1292.[26]  However, because

this court finds as a matter of law that Kizziah unreasonably delayed in reporting the many other

instances of alleged harassment by Hurst, it is unnecessary for this court to go any further.

Hurst's conduct on August 13, 2003, while reprehensible, would have been avoidable had the

plaintiff reported the numerous incidents that occurred between January 2003 and that date.

Kizziah alleged that Hurst had been harassing her continuously, both physically and verbally, for

---

[26]In discussing the matter, the Eleventh Circuit stated:

At least three other circuits have addressed, in some form, the practical difficulties of applying *Faragher* in cases involving claims of "sudden sexual harassment."  The question faced in those cases is whether an employer is liable for the harassment committed by its supervisors where neither party is at fault - *i.e.*, where the employer acts reasonably to prevent and correct any sexually harassing behavior, and where the employee avails herself, to the extent that she can do so, of any protections afforded by her employer.  One circuit has held that an employer is liable for any harassment that occurred prior to the corrective action. *See Greene v. Dalton,* 164 F.3d 671, 674-75 (D.C. Cir. 1999) (holding that the defendant could avoid liability in connection with a claim that a supervisor sexually assaulted a subordinate only if the defendant could show that the plaintiff failed to act reasonably in reporting the supervisor's behavior prior to the sexual assault).  Two other circuits have addressed the issue but have not rendered a definitive holding.  *See Todd v. Ortho Biotech, Inc.,* 175 F.3d 595, 598 (8th Cir. 1999) (explaining that the *Faragher* defense, which was "adopted in cases that involved ongoing sexual harassment in a workplace, . . . may not protect an employer from automatic liability in cases of single, severe, unanticipatable sexual harassment" and that the district court should address that issue on remand) & 599 (Arnold, J., concurring) (noting that the affirmative defense in *Faragher* affects both liability and damages, and that in cases of sudden sexual harassment, the defense merely lessens the defendant's damages, it does not "erase the tort completely."); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 267 (5th Cir. 1999) (opinion by Jones, J. with the other two panel members concurring in the judgment only, Judge Wiener concurring specially, *see infra*.) (Judge Jones assumed *arguendo* that a hostile environment claim had been stated, albeit a dubious one, and concluded that the employer is not vicariously liable for actionable harassment where both the employee and the employer act reasonably and promptly to address the situation); 168 F.3d 795, 804 n.52 (Wiener, J., specially concurring) (arguing that under *Faragher* and *Ellerth,* where a supervisor engages in "sufficiently severe conduct," such as rape, an employer may be vicariously liable even though the employer took prompt remedial action based on an employee's equally prompt complaint).  The EEOC takes the position that an employer is liable where both parties act reasonably to prevent and correct any sexually harassing behavior.  *See* EEOC Notice No. 915.002, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, at § V.B. (June 18, 1999), *available at* http://www.eeoc.gov/docs/harassment.html.  ("In some circumstances, . . . unlawful harassment will occur and harm will result despite the exercise of requisite legal care by the employer and employee . . .  In these circumstances, the employer will be liable because the [*Faragher/Ellerth*] defense requires proof that it exercised reasonable legal care *and* that the employee unreasonably failed to avoid the harm.").

*Walton*, 347 F.3d at 1291-92.

more than six months, yet she never mentioned anything to the persons identified in the
University's sexual harassment policy or even another supervisor.  Therefore, regardless of
whether the August 13th incident would constitute "sudden sexual harassment," Kizziah still
unreasonably delayed in reporting the many other incidents and *Faragher/Ellerth* provides a
complete defense to the plaintiff's claims under the circumstances.

In sum, the court finds as follows: (1) there was no adverse "tangible employment
action;" (2) the University exercised reasonable care in dealing with Hurst's conduct once it was
informed of the same as to each plaintiff; and, (3) the plaintiffs unreasonably failed to take
advantage of the preventive and corrective measures available to avoid the harm ultimately
inflicted by Hurst.  Accordingly, the court finds based on the circumstances that
*Faragher/Ellerth* does afford the University a complete defense to the plaintiffs' claims of
harassment.  Thus, summary judgment is due to be granted on the plaintiffs' harassment claims.[27]

### Retaliation

As stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended,
> 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made
> an unlawful employment practice by [Title VII], or because [the employee] has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L. Ed. 2d

509 (2001).  The plaintiffs assert that the same adverse "tangible employment action" alleged in

---

[27]To the extent that Thomas asserts that the defendant's policy includes a "glaring deficiency" in that "[i]t does not indicate to whom exactly Plaintiff is to report her supervisor's sexual harassment" and it "simply is confusing and deficient as a matter of law," the court is not impressed.  (Doc. 32 at pp. 13-14).  Although the policy does not identify one particular person by name, it affords the plaintiffs various avenues to pursue appropriate action.  (Ex. 8 (Part A) at pp. 000655).

response to the defendant's *Faragher/Ellerth* defense, also establishes a retaliation claim against the University.

The appropriate framework from which to evaluate the plaintiff's retaliation claim is the familiar *McDonnell Douglas* standard used in disparate treatment cases. The plaintiff has the initial "burden of establishing a prima facie case." *McDonnell Douglas,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). "If a plaintiff establishes a prima facie case of [retaliation], the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356, 1365 (M.D. Fla.) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)). Once a defendant has articulated its legitimate, nondiscriminatory reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the

48

plaintiff's prima facie case taken together with rejection of the employer's explanations for its action."  (*Id*.).

To establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entertainment Corp*., 139 F.3d 1385, 1388 (11th Cir.), *cert. denied*, 525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998).

In the present case, the first prong is uncontested.  The plaintiffs engaged in protected activity by filing a complaint with the University that their supervisor, defendant Hurst, sexually harassed them.  The University contests the second and third prongs, arguing that the alleged retaliatory conduct does not constitute a serious and material change in their terms, conditions, or privileges of employment and that there is no causal link between the protected activity and any adverse employment action.

As to Thomas, the University specifically notes that Thomas was given the same overall score of "4" for both performance evaluations during the relevant period.  (Doc. 27 at p. 32).  The defendant further notes that Thomas testified that she did not lose any money as a result of Hurst's evaluation, but instead, continued to receive raises and bonuses.  (*Id*.).  In addition, the defendant points out that Thomas was allowed to work football games during almost the entire 2003 football season, subsequent to her filing a sexual harassment claim against Hurst.  (*Id*.). The defendant further argues that any football games Thomas was prevented from working during the 2002 season was because of an alleged altercation with her supervisor (not Hurst) and

not because of her protected activity.[28]  (*Id*.).

In her response, Thomas alleges that the defendant should not have allowed Hurst to write her evaluation and that his negative comments will detrimentally affect her future employment and assignment opportunities.  (Doc. 33 at p. 16).  In addition, plaintiff Thomas alleges that sufficient evidence was demonstrated showing a loss of income resulting from not being allowed to work football games during 2002 and that such "blackballing" is sufficient to constitute an adverse employment action.  (*Id*.).

As to Kizziah, the University alleges that the written warning she received was no more than a counseling letter that "bringing sex toys and wearing an apron with an attached penis to the workplace is inappropriate behavior."  (Doc. 27 at p. 31).  It further asserts that the letter is consistent with the University's policy of progressive discipline.  (*Id*.).  Furthermore, the reprimand was not in response to her complaint, but was issued because of Kizziah's conduct.  (*Id*. at p. 32).  In addition, the University explains that the lateness in their response was due to the fact that they did not learn of the conduct until Kizziah's complaint prompted an investigation.  (*Id*.).

In *Gupta v. Fla. Bd. of Regents*, the court stated as follows:

> . . . .  An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.  Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause. . . .  Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis using both a subjective and an objective standard.

---

[28]Thomas received a written disciplinary action as a result of the altercation.  (*Id*.).  She does not dispute this assertion.

212 F.3d at 587 (internal citations omitted). With regard to both plaintiffs, the court finds that

they have not demonstrated an "ultimate employment decision . . . that 'alters [their]

compensation, terms, conditions, or privileges of employment, deprives . . . [them] of

employment opportunities, or adversely affects . . . [their] status as an employee.'" *Id.*

As to Thomas, the court again finds with regard to the retaliation claim that the employee

evaluation for 2002 that she feels Hurst should not have prepared does not constitute an adverse

employment decision. In view of the fact that her rating was the same as the year preceding her

complaint and demonstrated that she "exceeds expectations," the court finds this insufficient.

There is no evidence that she lost any compensation as a consequence of the evaluation. *See*

*Davis*, 245 F.3d at 1240-41 ("courts are wisely reluctant to treat job performance memoranda as

actionable under Title VII where they do not trigger any more tangible form of adverse action

such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline").

To the contrary, she testified that she received her raises and bonuses thereafter. No evidence

was presented to show that Hurst's specific criticisms in the evaluation resulted in a loss of pay,

negatively affected Thomas' employment status, or denied her future opportunities.

With regard to her working fewer football games during the 2002-2003 season, she has

not challenged the University's claim that the reduction was due to her altercation with another

supervisor at a football game and her write-up concerning that incident. Additionally, she has

not demonstrated that her compensation was lower for that time.[29]

---

[29]To the extent that Thomas argues in conclusory fashion that she "has presented sufficient evidence that she lost income as a result of not being allowed to work football games on [the] cleanup crew after making the complaint," the court disagrees. (Doc. 33 at p. 16). To the extent she argues that this case "is factually similar to the case of *Shannon v. BellSouth*, 292 F.3d 712 (11th Cir. 2002), holding that blackballing employee from overtime was a sufficient adverse employment action to constitute retaliation," the court finds that case factually inapposite. (*Id.*). In *Shannon*, the plaintiff demonstrated that "he was

Thomas also argues that, even if the conduct alleged individually falls short of an "ultimate employment action," the evidence considered in its entirety is sufficient to meet the "threshold level of substantiality" for an adverse employment action.  (Doc. 33 at pp. 16-17).  In determining "substantiality," "not everything that makes an employee unhappy is an actionable adverse action."  *Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004).  Although the determination of what is "substantial" is necessarily fact-intensive, even when considering Thomas' allegations in their entirety, they fail to meet the level of "substantiality" required for adverse employment action.

As to Kizziah's claim of retaliation, the court finds it to be insufficient as well.  The write-up she received is insufficient under the circumstances presented herein to constitute an adverse employment action.  Even if it were sufficient, Kizziah has failed to adequately rebut the same in her response.

To the extent that the plaintiffs' allegations can be read to include a claim that their transfers constitute adverse employment actions (see Second Amended Complaint at ¶ 35), the court again disagrees.[30]  The evidence demonstrates that the plaintiffs essentially performed the same duties at the same pay and benefits, but merely in different locations.  In *Benefield v. Fulton County*, 2005 WL 1006847 (11th Cir. 2005), the Eleventh Circuit in an unpublished opinion affirmed the granted summary judgment as to a retaliation claim involving a transfer, finding that

---

denied overtime in retaliation for his complaints of discrimination.  In a typical year, he testified, he earned $15,000 to $20,000 in overtime.  Now, he makes $1200 to $2000 in overtime."  *Shannon*, 292 F.3d at 714.

[30]Although this allegation is in the Second Amended Complaint, neither plaintiff argues the issue in their briefs.  Arguably, it has been abandoned.  *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) (Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.); see also *Bute v. Schuller Int'l, Inc*., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."), *Barnes v. Crowne Investments, Inc*., 391 F. Supp. 2d 1108 (S.D. Ala. 2005) (same).  However, out of an abundance of caution, the claim is being addressed by the court.

the transfer was merely a change in "work assignments" which did not constitute an adverse employment action. *Id*. at **3. Likewise, in *Gupta*, the Court found that the employer's refusal to give the plaintiff desired work assignments at certain hours and locations did not constitute adverse employment action. *Gupta*, 212 F.3d at 587-89.

In comparison, the plaintiffs' allegations that their new work areas require more work, and thus, are less desirable, fail to meet the level of "substantiality" required for an adverse employment action. No evidence was presented showing the new buildings are drastically different in their amount of work or working environment so that a transfer could meet the requisite level. In fact, the plaintiffs' own testimony appears to indicate that they are actually happy in their new employment. Therefore, because the transfers were merely an appropriate response to the allegations of harassment, such conduct does not meet the "threshold of substantiality" required to demonstrate an adverse employment action.

Even assuming that the plaintiffs' allegations are sufficient to constitute adverse employment actions, the plaintiffs have failed to present sufficient evidence to rebut the University's proffered legitimate, non-discriminatory reasons for its actions. For instance, Kizziah alleges that the defendant retaliated against her by giving her a written warning. However, she admits that she engaged in the inappropriate conduct, which was the basis of that warning, and presented no evidence showing that others engaged in similar conduct without being disciplined. Likewise, Thomas alleges that she was denied overtime during the 2002 football season, yet she admits that she was disciplined for an altercation with her supervisor and other co-workers, while working the 2002-2003 season. In addition, she continued to work football games during the subsequent 2003-2004 season, even after she filed her complaint.

Because the plaintiffs either have failed to allege conduct which constitutes adverse employment action and have failed to demonstrate sufficient weaknesses to rebut the defendants articulated reasons behind its actions, they have not presented a genuine issue of material fact for resolution for a jury.  The court finds that the defendant's motion is due to be granted on these claims.

## State Law Claims

In view of the court's ruling on the University's motion for summary judgment on the Title VII claim, the remaining claims are state law claims for invasion of privacy (Count Three) and assault and battery (Count Four) against defendant Hurst.  The relevant question at this juncture is whether the court should use its discretion to exercise its supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1267(c)(3); *see McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002) ("The Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction.").

The court determines that in view of the dismissal of all the federal claims, it should exercise its discretion to decline supplemental jurisdiction over the state law claims that remain against Hurst.  These state law claims are most appropriate for resolution by the Alabama state courts.

## CONCLUSION

Based on the foregoing, the court finds that the defendant's motion for summary judgment (doc. 26) is due to be granted on the plaintiffs' harassment (Count I) and retaliation (Count II) claims against the University.  The state law claims against Hurst are due to be

54

dismissed without prejudice to the plaintiffs' right to refile the same in state court.  A separate order will be entered in accordance with this Memorandum Opinion.

**DONE**, this the 31st day of March, 2006.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge